# CHARLESTON.

## NORTH AMERICAN COAL & COKE CO. v. O'NEAL et als.

### Submitted March 5, 1918.   Decided March 26, 1918.

1. CORPORATIONS—*Fraud—Bill by Corporation—Parties.*

    Where some of the promoters, who are also directors, officers and agents of a corporation, have surrendered to the corporation all the profits of a conspiracy to defraud the corporation and no further relief is desired or could be obtained against them, they are not necessary parties to a bill subsequently filed by the corporation against the other parties to the fraud to clear up the title to property, the subject matter of such fraud, and for an accounting by them for money and other property fraudulently obtained thereby. (p. 189).

2. SAME.

    Nor are the vendors who took from one or more of such conspirators notes and hold liens on such property for deferred payments of purchase money, not parties to the fraud, and who subsequently and before suit sold and transferred said notes to some of the parties to the fraud, and who have no further interest in the subject matter of the litigation, necessary parties to such suit. (p. 189).

3. EQUITY—*Bill—Multifariousness.*

    Nor is such a bill bad for multifariousness, where its object is to undo the wrongs and injuries perpetrated upon it by its directors, officers, and agents, and obtain good and clear title to the property and an accounting by the parties to the fraud of the money or other property the fruits of the conspiracy to defraud the corporation. (p. 190).

4. CORPORATIONS—*Promoters and Officers—Conspiracy—Sufficiency.*

Where one of the parties to such a conspiracy and who secured the options from the original owners of the property and as a part of the scheme fraudulently and secretly agrees with one or more of the other promoters and directors of the corporation to allow and pay them out of the price which he is to receive from a syndicate of which he is also a member and by and through which the property is to be by them so fraudulently transferred to the corporation at a price which will net to the syndicate a greater profit, he will be liable to account to the corporation for the sum so paid or agreed to be paid, in addition to other sums recoverable against him. (p. 190).

5. SAME—*Promoters or Directors—Secret Profits—Accountability.*

The general rule applicable to the facts in this case is that promoters or directors of a corporation, and those colluding with them, who in breach of their trust and in fraud of the corporation take to themselves secret profits, are liable to account to the corporation therefor.     (p. 190).

6. FRAUDULENT CONVEYANCES—*Relationship—Presumption.*

While dealings between persons standing in the relationship of brother-in-law and sister and affecting injuriously the rights of others are not presumptively fraudulent yet such relationship when fraud is charged calls upon the court for careful and close scrutiny of the transactions and conduct of and evidence offered by such persons and when such transactions involve the payment of large sums of money the testimony of such parties when uncorroborated by receipts, memoranda, and other documentary evidence must be clear, positive, definite, consistent with other evidence offered and free from contradiction.     (p. 195).

7. EVIDENCE—*Failure of Proof—Badge of Fraud.*

And if the party claiming the benefit of such transaction when assailed as fraudulent has it within his power to establish the facts relied on by satisfactory proof, his failure to do so constitutes a badge of fraud. (p. 195).

8. INFANTS—*Ratification of Contract—Effect.*

When an infant has once ratified his contracts after arriving at full age he can never afterwards elect to hold them void. (p. 198).

Appeal from Circuit Court, Barbour County.

Bill by the North American Coal & Coke Company against S. D. O'Neal and others. Decree for defendants, and plaintiff appeals.

*Reversed and remanded.*

82 W. Va.

*W. T. Ice, Jr., Jesse A. Fenner* and *Young, Stocker & Fenner,* for appellant.

*Blue & McCabe* and *Arthur S. Dayton,* for appellees.

MILLER, JUDGE:

The only questions, as we view the case, fairly arising upon the record and of which we will take cognizance, are presented by the errors and counter errors assigned and relied on by appellant and appellees.

Three preliminary questions involve the sufficiency of the bill: First, is the bill defective for want of necessary parties? Second, is it multifarious? Third, is relief barred by laches or limitation? All three questions were presented by the demurrer overruled by the circuit court.

Plaintiff predicated its right to the relief sought on conspiracy to defraud it in the sale to and purchase by it in 1903 of one thousand acres of coal and mining rights in Barbour County, originally conceived and perpetrated on it by its directors Knupfer, Berchtold, Scott, Clark, and Peters, and certain of its other officers and agents, and participated in by the defendant S. L. O'Neal, who, as part of the scheme, was to be and was made a director, and subsequently joined in by the defendants Lucy O'Neal, wife of said S. L. O'Neal, and by her brothers, the defendants J. L. and J. H. Knapp, if not also by the defendant the First National Bank of Philippi and others.

The main purposes of the bill were to clear up the title to the coal purchased by requiring defendants to surrender the purchase money notes, some of them executed by F. L. O'Neal, a nephew of S. L. O'Neal, to the original land owners, and the others by said Knupfer to said F. L. O'Neal, representing the conspirators, alleged to have been paid off and discharged out of moneys paid through said Knupfer to said S. L. O'Neal, or his wife Lucy O'Neal, and held by alleged assignments thereof to some of defendants, and to obtain releases of said liens, and also to obtain a surrender and cancellation of the shares of stock of the plaintiff, fraudulently issued to the said S. L. O'Neal and Lucy O'Neal, as part of the fraud and conspiracy aforesaid, and for an accounting by said S.

L. O'Neal and Lucy O'Neal for the moneys alleged to have been paid them by plaintiff, through its said directors, or some of them, as part of said scheme and for general relief. The bill also alleges in substance that said Knupfer, Clark, Scott, Peters, and Berchtold, had surrendered to plaintiff all of the stock which had been issued to them respectively pursuant to the said fraudulent contract, but that the said S. L. O'Neal and Lucy O'Neal, to whom other shares had been issued, though also called upon had declined to surrender the shares so issued to them or to account for the moneys received by them belonging to plaintiff.

With these general objects and purposes in view, it is contended by the demurrants, though the demurrer was general and not special, that Knupfer, Clark, Scott, Peters, and Berchtold, and also the original vendors of said coal, were necessary and proper parties to the bill. We do not think this point of demurrer is well founded. The bill alleges that Knupfer, Clark, Scott, Peters, and Berchtold, had each surrendered the benefits and all the benefits which they had received, so that no relief could be and none was demanded of them on this ground. And, moreover, so far as the allegations of the bill go, these parties had accounted to the other defendants for all moneys which had been paid to them; so that they have no rights or interests to prosecute or defend rendering them necessary parties, nor can they be materially interested in any decree that was or could be properly pronounced in the cause, wherefore not necessary parties. *Bragg* v. *United Thacker Coal Co.,* 70 W. Va. 655. The general rule that all persons interested in the subject matter of the suit should be made parties to the bill, either as plaintiffs or defendants, as laid down in *Beckwith* v. *Laing,* 66 W. Va. 246, is inapplicable.

But were the original or subsequent vendors having vendor's liens reserved in the deeds in question necessary parties? The bill prays that the present claimants and holders of the notes, the Knapps and others, be required to surrender the notes for cancellation and release the liens. It does not appear that the vendors have or will decline to join in such releases. The statute, section 2, chapter 76, requires the as-

signee of such lien to join therein, and section 6, of said chapter, provides for the execution of such release on mere notice, and until such vendor has declined to execute the release upon demand or request of the grantee, one holding under him, it would be unfair to involve such vendor in an expensive litigation, in which he has no other interest, and particularly such a litigation as this involving fraudulent transactions between other parties. *Morgan* v. *Ice,* 80 W. Va. 273. The case of *Bryan* v. *McCann,* 55 W. Va. 372, holding that the trust creditor is a necessary party to a suit by the trustee to remove cloud, ascertain the amount of the trust debt, and sell the trust subject, cited and relied upon by counsel for appellant, is, therefore, inapplicable.

Now with respect to the question of multifariousness relied upon. The rule against multifariousness is generally regarded as one of convenience. And where the matters contained in the bill are not wholly distinct and separate, and it is more convenient to litigate and dispose of them in one suit than in two or more, and this can be done without injustice to any one, the objection of multifariousness will be disregarded. *Johnson* v. *Sanger,* 49 W. Va. 405; *Dillard* v. *Dillard,* 97 Va. 434; *Dudley* v. *Niswander,* 65 W. Va. 461; *Pack* v. *Whitaker,* 110 Va. 122; *Johnson* v. *Black,* 103 Va. 477; *Ross* v. *Ross,* 72 W. Va. 640. And as was said in *Baker* v. *Berry Hill etc. Co.,* 109 Va. 776, in cases involving the question of fraud, a very great latitude is allowed in pleading, both as to the circumstances charged and parties impleaded, provided one connected scheme of fraud be averred.

On the subject of laches and limitations we think the bill alleging as it does prompt action as soon as the fraud was discovered, sufficiently negatives that defense.

On the merits both parties first complain of the decree in favor of the plaintiff against S. L. O'Neal for $7,491.86; the plaintiff that the decree should have included also $3,000.00 in round numbers, which S. L. O'Neal, who claimed to own and control options on the coal, fraudulently agreed to allow to Knupfer and Peters, then directors, and subsequently codirectors with him, in the plaintiff company, as commissions or compensation for putting through the fraudulent agree-

ment with and sale to the plaintiff company of this coal at the price of $100,000.00, or at the rate of $100.00 per acre, which he had agreed with the syndicate, composed of Knupfer, Peters, and others, directors, he would sell to them at the rate of $30.00 per acre, subject to a commission or compensation to Knupfer and Peters of $3,000.00, as aforesaid; and O'Neal's complaint is that any sum was decreed against him.

The basis of this decree was, and the court therein found as a fact, that fraud and conspiracy had been practiced upon the plaintiff company substantially as alleged in the bill; that the coal which O'Neal by option contracts had contracted for with the original owners, at $22.00 per acre, and by a fraudulent agreement had conveyed to a syndicate, of which he was one of the members, at $30.00 per acre, with a secret agreement with Knupfer and Peters, to allow and pay them at the rate of $3.00 per acre, as a profit or commission, for negotiating the scheme, the syndicate had unloaded upon the plaintiff company, at the rate of $100.00 per acre, or in round numbers $100,000.00, but subsequently modified by an agreement to accept $50,000.00 in cash, and $50,000.00 in stock of the plaintiff company. And the amount so decreed against said O'Neal was the difference between the sum of $37,666.00, which the court found had been paid to him, and the sum which he should have received for the coal and surface land covered by the contract, at the rate of $30.00 per acre for the coal, and 56 acres of surface at the rate of $40.00 per acre, and deducting $4,398.56, for the Crim coal, of 146 acres lost to the plaintiff, by the negligence of the said O'Neal, as alleged in the bill.

If O'Neal was guilty as alleged and found by the court, of aiding and abetting his co-conspirators in unloading upon plaintiff coal and surface lands which cost him but $22.00 per acre, we do not see why he was not liable to plaintiff for all the money which he received over and above the twenty seven thousand odd dollars, which the property would have netted him; his profits on the coal would then have been the difference between $22.00 per acre and $27.00, or $5.00 per acre. The fraudulent agreement which he entered into with his associates, however, was that he was to share with them

also in all that was received from the plaintiff company over and above the price of thirty dollars per acre. We have carefully considered the evidence, and we are of opinion that the decree was well founded on fraud, and our conclusion is that the court erred in not including in the decree against O'Neal, the sum of $3,000.00 which he agreed to allow and pay to Knupfer and Peters, and that the decree should be corrected accordingly. There is nothing disclosed in the facts of this case to take it out of the general rule that promoters or directors of a corporation, or those colluding with them, who in breach of their trust and in fraud of the corporation, take to themselves secret profits, are liable to account for the same to the corporation. 10 Cyc. 276; *The South Joplin Land Co. v. Case,* 104 Mo. 572; *Camden Land Co. v. Lewis,* 101 Mc. 78; *Yeiser v. United States Board & Paper Co.,* 46 C. C. A. 567; *Central Trust Co. v. East Tennessee Land Co.,* 116 Fed. Rep. 743; *Hayward v. Leeson,* 176 Mass. 310. In the Maine case the court at page 95 says: "It may be conceded, for it is well settled and true, that promoters of a corporation stand in a fiduciary relation to the corporation, and to its subscribers for stock, and to those who it is expected will afterwards buy stock from the corporation. The promoters owe to them the utmost good faith. And if they undertake to sell their own property to the corporation they are bound to disclose the whole truth respecting it. If they fail to do this, or if they receive secret profits out of the transaction, either in cash or by way of allotments of stock, when there are other stockholders, or it is expected that there will be other holders of new and additional stock, undoubtedly the corporation may elect to avoid the purchase; or it may hold the promoters accountable for the secret profits, if in cash; or may require a return of the stock if unsold; or if sold, an accounting for the profits of its sale."

We, therefore, affirm the point of error by the plaintiff, as to this part of the decree, and deny that of O'Neal.

The second point of error urged by appellant relates to a note of October 10, 1904, for $2,772.75, executed by F. L. O'Neal to Lucy O'Neal, and held by the First National Bank of Philippi as collateral security for a certain note of

S. L. and F. L. O'Neal for $2300.00, and to secure which said bank also held another note of said Karl A. Knupfer to F. L. O'Neal for $1,000.00.     This $2,772.75 note as well as the $1,000.00 note, are prior purchase money notes for which liens were retained on the coal purchased by plaintiff, the first in the deed of October 10, 1904, from Lucy O'Neal to said F. L. O'Neal, for three of said tracts; the second being one of the notes executed by said Knupfer to said F. L. O'Neal and for which a lien was also reserved in his deed. And in addition to this collateral and to secure certain notes of said Lucy O'Neal to which still other notes were pledged as collateral, said bank also held a certain deed of trust executed by said S. L. O'Neal and Lucy O'Neal on a house and lot in the City of Philippi.     The decree found that said $2,772.75 note when so assigned to the bank was the property of S. L. O'Neal, and that he was bound by his contract to discharge the same as a lien on the coal sold and conveyed to the plaintiff company, and that as between him and other parties, except the bank, as innocent holder thereof, said note was thereby cancelled and annulled, and should, subject to the rights of the bank, be surrendered and delivered up to plaintiff.     And respecting the right of the bank thereto and also to the note of $1,000.00, the Karl A. Knupfer note, it was further decreed that in addition to said two notes it also had other security for its indebtedness against S. L., Lucy, and F. L. O'Neal, and that it be and was thereby ordered and required to exhaust the other securities so held by it before proceeding to collect said $2,772.75 note, but that "in exhausting said other security nothing herein shall limit the lawful right of said bank to apply the proceeds of such other security to that indebtedness held by it which is least secured, provided, that the proceeds from such other securities shall not be applied upon any debt not specifically secured by such other security."     The point of criticism of the decree is that the court decreed the $2,772.75 note paid as to everybody except the bank, and as the record showed that in addition to the other collateral, the bank held a deed of trust on the property of Lucy O'Neal, of October 10, 1904, mentioned in an agreement between it and said Lucy, S. L., and F. L. O'Neal, which

the evidence showed or tends to show was sufficient to pay all the debts for which said collateral was held, and that the bank should not be allowed to sell said real estate and apply the proceeds to the discharge of other indebtedness not mentioned or included in said agreement. We do not find the deed of trust in the record, but according to the recitals in the agreement, it secured only the notes for which said collateral was pledged. As we interpret the decree this deed of trust is included in the terms ''other security'' employed therein, and that according to the decree the bank is required to sell said real estate covered by said deed of trust and apply the proceeds thereof to discharge said debts before resorting to said $2,772.75 note; thus interpreted it accomplishes all that appellant contends for, unless it be as to the Knupfer note of $1,000.00, and the notes of said F. L. O'Neal to L. E. Boylen and J. E. Strader, Executor, respectively, the first for $300.00, and the second for $716.88, given by said O'Neal to them as original owners of some of the coal conveyed to plaintiff, and which said S. L. O'Neal was likewise bound to pay and discharge for appellant's protection. The decree, we think, should have also protected the appellant against those notes and also the Knupfer note, it being paid, by requiring the bank to pay all said debts out of the proceeds of the sale of Mrs. O'Neal's property covered by said deed of trust so far as the same will go before resorting to said collateral notes, and when the case goes back to the circuit court for final decree in accordance herewith it will so provide.

The next point to be disposed of is that the decree erroneously adjudged and ordered that the defendant J. L. Knapp was the owner and holder for value of the following notes executed by said F. L. O'Neal, and which S. L. O'Neal and others, members of said syndicate, were obligated to pay, namely: A note of June 21, 1904, given to David L. Thrash for $1,000.00, subject to certain credits; one of May 28, 1904, given to Zoa H. Malcolm, for $2,000.00; one of June 18, 1904, given to Mary E. Green, for $153.00; one of August 6, 1904, to Edwin C. Wells for $201.00; one of June 18, 1904, to J. Ed Malcolm, for $305.50, subject to certain credits; one of June 18, 1904, to J. E. Strader, Executor, for $716.88, and

one of October 17, 1904, to L. E. Boylen, for $300.00. The two latter notes were not claimed by said Knapp in his original answer, but were in the amended answer filed by him, and are the same notes heretofore referred to as held by said bank as collateral to the notes, not of himself, but of said S. L. and Lucy O'Neal. These were all notes given by said F. L. O'Neal to the original owners of the coal sold to appellant, and which Knapp claimed as purchaser directly from them with his own money, in good faith, without notice, and before maturity. The validity of his claim was assailed in the bill as fraudulent and void; established first, by the relationship between him and said S. L. O'Neal and Mrs. O'Neal, being that of brother-in-law and sister; second, by the original fraud practiced upon the appellant in the sale and purchase of said coal as alleged; third, by the fact that appellant had already paid to said S. L. O'Neal and others about $38,000.00, and more than it should be required to pay, and which was to be, but was not, applied to pay off and discharge purchase money notes outstanding and existing as liens on said coal, including the Knupfer notes, and most of which money has been traced into the bank account kept by said S. L. O'Neal in the name of his wife Lucy O'Neal, and paid out by checks issued by him in her name; fourth, by the fact that all of said notes now claimed by said J. L. Knapp are shown to have been paid for out of the account of said Lucy O'Neal by checks issued by said S. L. O'Neal in her name and into which account a large portion of the money paid by appellant was traced, including the L. E. Boylen note and the J. E. Strader note, to which reference has been made; fifth, that all the transactions with the original owners relating to the purchase of said notes were conducted by S. L. O'Neal, he and said Knapp claiming that O'Neal was acting as his agent; sixth, by the failure of said O'Neals and Knapp to produce any checks, receipt, or books of account showing payment by said Knapp for said notes, out of any funds belonging to him; seventh, many other badges of fraud and suspicious facts and circumstances in the case.

It is contended on behalf of Knapp that the relationship of brother-in-law and sister does not preclude dealings between

them, and is not sufficient to cast the burden on him of showing want of good faith, bona fides, and actual payment, but that that burden rested on appellant, not sustained by it, by any evidence in the case, and that when Knapp in answer and deposition swore that his purchase of said notes was with his own money and in good faith, the whole burden rested on plaintiff to establish fraud by clear and certain proof. Citing among others the case of *Colston* v. *Miller,* 55 W. Va. 490.

But the case cited while not denying to persons standing to each other in such relationship the right to deal with each other without presumption of fraud against them, it does hold that such relationship calls upon the court for careful and close scrutiny of the transactions and conduct of and evidence offered by such persons, and that to sustain the claim of payment of large sums of money the testimony of such claimant, if uncorroborated by receits, memoranda, or other documentary evidence, must be clear, positive, definite, consistent with other evidence offered, and free from contradiction. Knapp does not claim to have purchased these notes directly, but through S. L. O'Neal, his agent, by power of attorney to do so, and that from time to time he placed funds in his hands to buy the notes in question. But where did the funds come from, and if provided, why put them to the credit of Lucy O'Neal? Knapp and his brother J. H. Knapp, swear that the money used represented loans which the latter had arranged with a Parkersburg insurance company, of which he was then an officer, and with the Baptist Education Society, of which he was treasurer. But the officers of the insurance company swear it was not the business of said company to loan money, and that its records and books disclose no such loan, and no note, check, receipt, voucher, or other documentary evidence was produced showing any loan to said Knapp by said Baptist Education Society.

True the record shows that Knapp claims to have purchased from F. L. O'Neal some $9,000.00 of the Knupfer notes, executed to F. L. O'Neal, and that some of the money paid on those notes may have gone to the credit of Lucy O'Neal in the bank, but F. L. O'Neal was the mere agent of S. L. O'Neal and others to do their bidding. Knapp fails to show

payment of anything for these notes, and the bank account of F. L. O'Neal fails to show any deposits as coming from said Knapp. Some of the proceeds of the Karl A. Knupfer notes apparently went to the credit of Knapp in the First National Bank of Philippi, but that account discloses no payments to F. L. O'Neal, nor does he or any witness show how he acquired title to those notes for value paid or agreed to be paid. The failure of Knapp and those with whom he dealt to show payment, and the relationship in which he stood to the parties to this transaction called for full and complete proof of the bona fides thereof. If the facts were as contended by Knapp he had it within his power to establish them by satisfactory proof, failing in which constitutes a badge of fraud. Bump on Fraudulent Conveyances, section 66, page 55; 20 Cyc. 453; *Mauch Chunk Nat. Bank* v. *Shrader et al.,* 74 W. Va. 310. Scrutinizing this evidence as we are required to do, and after a careful consideration thereof we hold that fraud is established and that said Knapp has no equitable right or title to the notes claimed by him, or either of them, and except subject to the rights of said bank to the two notes held by it, that they should be surrendered and cancelled and the liens therefor released of record.

The next point is that the court erred in decreeing that the defendant J. H. Knapp, another brother-in-law of said O'Neal was the owner in good faith for value of other of said purchase money notes of said F. L. O'Neal as follows: First, a note of May 28, 1904, for $2,000.00, given to Zoa H. Malcolm; second, a note of January 21, 1904, for $1,000.00, executed to David L. Thrash; third, a note of June 27, 1904, for $1264.50, given to L. C. Criss. To establish fraud on the part of Knapp and the O'Neals in respect to these notes appellant relies in part on the same facts disclosed in relation to the notes claimed by J. L. Knapp. The method of paying for these notes was different from that adopted in the payment of the notes claimed by J. L. Knapp, but the transactions were conducted, in part at least, through S. L. O'Neal.

With respect to the Zoa H. Malcolm note, the evidence shows that Knapp paid through the Union Trust and Deposit Company, of Parkersburg, a draft for $1,900.00, drawn upon

him through the First National Bank of Philippi, with note attached, and he swears that he borrowed the money therefor from the West Virginia Baptist Education Society, and contrary to a previous statement by him that he paid this draft by check, he swore later by way of correction that no part of the same was paid by his check, but was paid directly to the trust company by the Baptist Society. He was at the same time treasurer of this society, but produces no record of said loan by said society. He does produce and file a note signed by himself to said society, but no evidence of the payment thereof except the note and its possession, which note bears no endorsement or other evidence that it was in the possession of said society, other than in his possession as treasurer. It is also shown that on February 2, 1907, said Baptist Society had a credit in the Union Trust and Deposit Co., of $2303.68, and that it was debited with $2003.63, and Knapp swears that the debit included the draft upon him for $1900.00. However, the evidence of Neal, Assistant Treasurer of the trust company shows that the deposit of $2303.68 included a check for $1950.00, drawn by J. L. Knapp upon his account in said trust company. Where did J. L. Knapp obtain the money to his credit in the trust company, and for what or upon whose account did he pay $1950.00 to the Baptist Society? This is not explained. The evidence shows, however, that the money to his credit in the trust company was money transferred from his account in the First National Bank of Philippi, and represented by his check for $4753.49, and that this money so transferred from the Philippi bank represented money paid by appellant on the Karl A. Knupfer notes, and which Knapp claimed to own, but failed to show valid title thereto as we have already decided with reference to the decree in his favor. So that it seems clear that the money of appellant, and not that of J. H. Knapp, though indirectly, paid for the Malcolm note, and that J. H. Knapp has no valid legal or equitable claim thereto.

Next, as to the David L. Thrash note. Knapp swears that he also borrowed the money to buy this note from the Baptist Education Society, and paid for it in substantially the same way, the draft drawn on him in this instance being for

$1125.00; but in this case the evidence shows that J. L. Knapp drew his check not on the Union Trust and Deposit Company, of Parkersburg, but on the Philippi bank, for $1130.00, in favor of the Baptist Society, which was endorsed by J. H. Knapp, as treasurer, and was placed to the credit of said society in said trust company, and there is no evidence of any loan by said society to him, and it clearly appears that it was the money so transferred by J. L. Knapp to the Parkersburg trust company that paid for the Thrash note. No explanation is otherwise made of the giving of this check to the Baptist Soceity, and we think this also represented the money of appellant paid on the Knupfer notes as in the first instance. So we conclude that J. H. Knapp has no legal or equitable right or title to this note, and that it should also be surrendered by him for cancellation.

With respect to the L. C. Criss note for $1264.50, subject to credits reducing it to about $500.00, the evidence going to establish fraud is not so clear. Appellant's counsel say little about it. Knapp says he paid $475.00 for this note, but the balance due thereon was $500.00, and that he borrowed the money to buy it from the estate of Thomas E. Davis; but he produces no note, check, draft, or other documentary evidence of such loan. The only documentary evidence of his owner-ship was his possession and production of the note before the notary taking his deposition; and if his supposed indebtedness to the Davis estate was represented by any note or other paper obligation he failed to produce the same, or any evidence of the repayment thereof, or explain or account for their absence. In view of his relationship to the parties to the transaction, and considered in connection with the evidence of his fraudulent transaction with respect to the two other notes claimed by him and the manifest design and purpose of the O'Neals to defraud the appellant by keeping said purchase money notes alive in the hands of their friends and relatives and impose on it the burden of re-payment thereof, we are disposed to hold upon well recognized principles of evidence that the whole of these transactions, relating to the purchase money notes, including this Criss note, were fraudulent and that the latter note in the hands of said Knapp ought to be

surrendered by him for cancellation and release of the lien therefor. *Colston* v. *Miller, supra.* If he actually borrowed money from the Davis estate he should under the circumstances have produced better evidence thereof. The representative of the estate could have been produced; he could and should have produced his check given in payment, if any, or the evidence of the debt, if still owing, and showed how and by what channel the money came to him as a loan, but he furnished no such evidence, and the facts of any such loan are, to say the least of it, open to the gravest suspicion.

The last point of error relied on by appellant is that the court should have decreed an accounting by Lucy O'Neal. If the point is well founded, as we think it is, it should have also decreed an accounting by S. L. O'Neal. for the evidence satifies us, that the account standing in her name, and into which thousands of dollars paid by appellant went, was in fact S. L. O'Neal's account, and that he simply used her name with her consent to further his fraudulent purposes, and that both are liable to account therefor, beyond the amount to which he was lawfully entitled by the principles of this decision.

Apparently as a last effort to save herself from liability Lucy O'Neal filed an amended answer pleading infancy. But by filing her joint answer after she reached her majority she ratified all previous contracts. Besides after she became of age she received or had placed to her credit more than $15,-000.00, the proceeds of checks given by Knupfer out of money provided by appellant. So her plea is not good to defeat relief against her, and was properly denied by the circuit court. Phillips on Pleading, section 240; *Hobbs* v. *Hinton Foundry, Machine & Plumbing Co.,* 74 W. Va. 443. Where an infant has once ratified his contracts after arriving at full age he can never afterwards elect to hold them void. *Gillespie* v. *Bailey,* 12 W. Va. 70.

Having reached these conclusions, the question comes what decree should be pronounced here. As the matters involved are more or less complicated, and having settled the principles of the cause, we have concluded to reverse the decree in toto and to remand the cause with directions to the circuit court

after the accounting ordered to pronounce a new decree in accordance herewith, and for further proceedings to be had therein according to the rules and principles governing courts of equity.

*Reversed and remanded.*